UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CBI CAPITAL LLC,

                    Plaintiff-Counterclaim Defendant,

           -against-

MIKE MULLEN and MIKE MULLEN ENERGY
EQUIPMENT RESOURCE, INC.,

                    Defendants-Counterclaim Plaintiff

MIKE MULLEN ENERGY EQUIPMENT
RESOURCE, INC.,

               Third-Party Plaintiff,

           -against-

EVAN CLAAR,

                Third-Party Defendant

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7/16/2020___

19 Civ. 5219 (AT)

**ORDER**

ANALISA TORRES, District Judge:

      Plaintiff, CBI Capital LLC ("CBI"), brings this action against Defendants, Mike
Mullen Energy Equipment Resource, Inc. ("MMEER") and Mike Mullen, asserting three
causes of action arising out of a joint investment agreement to design, construct, and lease an
accommodation rig for oil and gas workers at sea: (1) a breach of contract claim against
MMEER, (2) a breach of contract claim against Mullen, and (3) a breach of personal
guarantee claim against Mullen. *See* Compl., ECF No. 34.

      MMEER brings two counterclaims against CBI and a third-party complaint against
Third-Party Defendant, Evan Claar, the principal of CBI, arising out of Claar's alleged oral
promise to raise funds for the joint venture: (1) a breach of contract claim against CBI, (2) an
equitable accounting claim against CBI, and (3) a fraud claim against Claar. Counterclaims
and Third-Party Complaint ("Third-Party Compl."), ECF No. 63.

Now before the Court are (1) Mullen's motion to dismiss counts two and three of the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), ECF No. 44, and (2) CBI and Claar's motion to dismiss the counterclaims and the third-party complaint for failure to state a claim under Rule 12(b)(6), ECF No. 74.

For the reasons stated below, both motions are GRANTED.

## BACKGROUND

The following facts are taken from the complaint, counterclaims, and third party complaint, and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015).

I.   The Complaint

CBI—a limited liability corporation that invests in oil and gas equipment—alleges that, in 2012, CBI and MMEER—a corporation that builds and designs oil and gas equipment—began discussions to jointly invest in, construct, and lease an accommodation rig, which would provide housing and other services for oil and gas workers at sea.  Compl. ¶¶ 3, 4, 9; Third-Party Compl. ¶ 4.  In December 2012, MMEER contracted with Dalian Shipbuilding Industry Offshore Co., Ltd. ("DSIC") to build the rig for $150 million, with an expected delivery date of June 2015.  *Id.* ¶ 11; Third-Party Compl. ¶¶ 10–12.  DSIC required that CBI and MMEER make an initial payment of $15 million, with the remaining balance due on delivery of the rig more than two years later.  Compl. ¶ 12.  The parties intended to find an entity to lease the rig.  *Id.* ¶ 9.

On February 22, 2013, Mullen, MMEER's principal, went to CBI's offices to discuss the specific terms of the joint investment with Claar, CBI's principal.  *Id.* ¶ 14.  Mullen and Claar negotiated the terms of an "[a]greement [a]mong [i]nvestors" (the "Agreement").  *Id.* ¶¶ 16–17;

2

Agreement at 1, ECF No. 34-1.  Although the Agreement contemplated an initial $9 million payment to DSIC, the parties also needed to raise an additional $6 million for the initial deposit, $5 million for early operating expenses, and $135 million to cover the rest of the contract with DSIC.  Compl. ¶ 18.  The parties ultimately raised $164 million for the DSIC contract.  *Id.*[1]

Mullen and Claar discussed the fact that a large portion of the additional funds would need to come from other equity investors.  *Id.* ¶ 19.  The parties understood that the completion of the project could require raising substantial cash, which would dilute both CBI and MMEER's respective stake in the joint venture.  *Id.*

Claar expressed concern that CBI and MMEER might not be able to raise the additional money, and that even if they did, the value of CBI's initial investment would be subject to significant dilution by the addition of other equity investors.  *Id.* ¶ 20.  To address CBI's concerns and to persuade CBI to contribute $6 million toward the initial payment, Mullen suggested that CBI be given the option, on an annual basis, to "put"[2] its investment to MMEER, and that CBI be repaid at a 12% interest rate.  *Id.* ¶ 21.  Claar questioned whether MMEER would have enough cash to satisfy the put obligation.  *Id.* ¶ 22.  Mullen responded that he would personally guarantee MMEER's put obligation.  *Id.* ¶ 23; Agreement § 3.  Mullen stated that he had the money to cover his guaranty and would have significant cash inflows the following year, and that he had real estate assets in Los Cabos, Mexico, and Aspen, Colorado, in addition to his home in Dallas, Texas, which he could use to meet his guaranty.  Compl. ¶ 24.

---

[1] The disparity between the amounts alleged—the $150 million figure contemplated by the Agreement and the $164 million raised—is not explained by the pleadings.  In any event, the difference is not material to resolving the parties' motions to dismiss.

[2] "A put is an options contract that gives the owner the right, but not the obligation, to sell a certain amount of the underlying asset, at a set price within a specific time."  Rajeev Dhir, *Put Definition*, Investopedia (Apr. 6, 2020), https://www.investopedia.com/terms/p/put.asp.

Under the Agreement, CBI agreed to contribute $6 million and MMEER agreed to contribute $1.5 million to jointly form CBI-MMEER Accommodations Ltd. ("Accommodations Ltd."), a company that would oversee the design, construction, and leasing of the rig.  *Id.* ¶ 28; Agreement §§ 1, 6.  CBI then had the option of raising an additional $1.5 million from third parties.  Compl. ¶ 28; Agreement § 1.  The ownership of Accommodations Ltd. was divided on the basis of these contributions, with CBI owning 66.67%, MMEER owning 16.66%, and a group of third parties organized by CBI owning 16.66%.  Compl. ¶ 28; Agreement § 1.

Section 3 of the Agreement contained a provision granting CBI the option to put its investment to MMEER for $6 million cash, plus 12% annual interest (the "Put Provision").  Compl. ¶ 29; Agreement § 3.  CBI could exercise the Put Provision at its sole discretion by providing email notice to MMEER at any time up to March 1 of 2014, 2015, or 2016.  Compl. ¶ 29; Agreement § 3.  The Put Provision states, "Mike Mullen agrees to provide his personal guarantee to stand behind the [p]ut to MMEER in order to ensure payment in full if necessary" (the "Personal Guaranty").  Compl. ¶ 33; Agreement § 3.

In February 2016, CBI sent Mullen an email notice stating that CBI was exercising its put option and requesting payment.  *Id.* ¶¶ 39–40.  At this time, neither party had raised any equity beyond the $9 million contemplated in the Agreement and the only other financing was through debt, so neither party's initial investment had been diluted.  *Id.* ¶ 41.

Despite CBI's notice, neither MMEER nor Mullen paid CBI.  *Id.* ¶ 42.  By letter dated April 27, 2016, Mullen stated to CBI that the Agreement was "unenforceable," that he was not "personally under any obligation to guarant[ee] such a put," and that he was refusing to pay.  *Id.* ¶ 43 (internal quotation marks and citations omitted); *see* ECF No. 34-2.

CBI brings this action to enforce the Put Provision against MMEER and the Personal

Guaranty against Mullen, alleging that $12,033,340 is due as of the filing of the complaint. Compl. ¶¶ 53–77.

II.     The Counterclaims and Third-Party Complaint

Mullen and MMEER offer a different version of the facts in their counterclaims and third-party complaint.

According to Mullen and MMEER, in early 2013, before the parties entered into any agreements, Claar represented to MMEER that he and CBI were "sophisticated financiers" who, in addition to providing a portion of an initial payment to build the accommodation rig, could obtain $150 million in debt financing necessary to complete the rig.  Third-Party Compl. ¶ 13; Counter-Pl. Opp. at 1, ECF No. 78.  Based on these representations, MMEER and CBI entered into the Agreement, whereby CBI agreed to obtain all debt financing beyond the initial payment and MMEER agreed to handle the construction planning and technical compliance for the rig. Third-Party Compl. ¶¶ 14, 52.  MMEER claims that the debt financing CBI was to obtain included a loan of approximately $100 million from the Bank of China ("BOC").  Counter-Pl. Opp. at 5.

However, CBI failed to procure the money it promised to raise, prompting MMEER to seek other sources of financing.  Id. ¶¶ 21–25.  Additionally, MMEER learned of an opportunity to place a bid to lease an accommodation rig to Maersk Oil & Gas Denmark.  Accommodations Ltd. placed a bid and won the contract (the "Maersk Contract").  Id. ¶¶ 26–27.  The Maersk Contract imposed a delivery date for the rig, which meant that Accommodations Ltd. had to raise substantial financing on a short timeline to complete construction.  Id. ¶ 30.  MMEER alleges that because the parties had to raise funds quickly to compensate for the financing shortfall of CBI's making, CBI ended up negotiating a financing arrangement that contained unfavorable

terms.  *Id.* ¶¶ 31–35.

Specifically, CBI entered into a deal with Paragon and Phoenix Assets, LLC, whereby, in exchange for $65 million, Accommodations Ltd.'s ownership in the rig was diluted from 100% to 12.16%.  *Id.* ¶¶ 35–36.  As a result, the value of the Maersk Contract to Accommodations Ltd. decreased by $191 million.  *Id.* ¶ 36.  In addition to damages resulting from dilution of Accommodations Ltd.'s ownership in the rig, MMEER also claims that CBI withheld Accommodations Ltd.'s financial records in a way that made it impossible for MMEER to determine the full extent of the damages from dilution.  *Id.* ¶ 62.

## DISCUSSION

### I.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotation marks omitted)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id.*  A court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

In considering this motion to dismiss, the Court relies on the pleading and documents attached to and incorporated by reference into the pleadings, which may be considered in a

motion to dismiss.  *Bartlett v. Honeywell Int'l Inc.*, 737 F. App'x 543, 548 (2d Cir. 2018) (citing *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

II.    <u>Analysis</u>

    A.  Plaintiff's Claims

        1.  Breach of Personal Guaranty

New York law governs the parties' disputes concerning the Agreement.  *See* Compl. ¶ 7. To plead a prima facie case of a breach of personal guaranty claim under New York law, a plaintiff must establish:  "(1) an absolute and unconditional guaranty, (2) the underlying debt, and (3) the guarantor's failure to satisfy the unpaid debt."  *Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*, 171 F. Supp. 3d 107, 121 (S.D.N.Y. 2016) (citing *City of New York v. Clarose Cinema Corp.*, 681 N.Y.S.2d 251 (App. Div. 1998)).

Defendants argue that Mullen's signature in his corporate capacity does not evince an intention to assume personal liability and that the Personal Guaranty is an illusory promise.  Def. Mem. at 2–3, ECF No. 46.  The Court agrees in part—although Mullen's signature demonstrates an intention to assume personal liability, the Personal Guaranty is an unenforceable illusory promise due to its indefiniteness.

To begin, the Court concludes that Plaintiff adequately alleges Mullen's intent to assume personal liability.  Under New York law, an agent who signs an agreement in her corporate capacity will not be bound to the terms of the agreement unless there is "clear and explicit evidence of the agent's intention" to be personally liable.  *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991) (quoting *Mencher v. Weiss*, 114 N.E. 2d 177, 179 (N.Y. 1953)).  To assess the signatory's intention, the Court looks to what are known as the "*Lollo* factors":  "[1] the length of the contract, [2] the location of the liability provision(s) in

relation to the signature line, [3] the presence of the signatory's name in the agreement itself,
[4] the nature of the negotiations leading to the contract, and [5] the signatory's role in the
corporation." *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal
Servs. Fund & Annuity Fund v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994); *see Integrated Mktg. &
Promotional Sols., Inc. v. JEC Nutrition, LLC*, No. 06 Civ. 5640, 2006 WL 3627753, at *3
(S.D.N.Y. Dec. 12, 2006) (holding that the *Lollo* factors apply to personal guaranty provisions).
Additionally, the Second Circuit has suggested examining the structure and content of the
signature lines to determine whether the agent intended to sign the contract in his corporate
capacity only. *Lerner*, 938 F.2d at 5. The Court examines each of these considerations in turn.

The first and second *Lollo* factors—the length of the contract and location of the guaranty
clause—weigh in favor of finding personal liability, because the Agreement is only two pages
long and the Personal Guaranty is on the page directly before the signature line. *See* Agreement.
Thus, the contract "was not a trap for an unwary signatory." *Lerner*, 938 F.2d at 5 (noting that
an individual liability provision in a three-page contract supports finding personal liability). The
third factor—the presence of the signatory's name—weighs in favor of finding personal liability
as well, because Mullen's name is in the text of the Personal Guaranty. *See* Agreement at 2
("Mike Mullen agrees to provide his personal guarantee . . . ."); *see Lerner*, 938 F.2d at 5 (noting
that the signatory's name appearing in the agreement itself is a strong indication of intention to
assume personal liability). The fourth factor—the nature of negotiations leading to the
contract—also weighs in favor of Plaintiff, because the parties negotiated the Agreement in
depth on the same day they signed it, and Plaintiff claims that Mullen himself suggested the
Personal Guaranty. Compl. ¶¶ 23–24; *see Paribas Properties, Inc. v. Benson*, 536 N.Y.S.2d
1007, 1009 (App. Div. 1989) (finding a negotiated and edited agreement to support intent).

Finally, the fifth factor—the signatory's role in the corporation—similarly weighs in favor of Plaintiff, because Mullen is the owner and president of MMEER, the corporation in question. Compl. ¶ 5; *see Lerner*, 938 F.2d at 5 (holding that a signatory being the president and principal shareholder of the corporation in question favors finding intent).

Next, the structure and content of the signature line are neutral. Plaintiff argues that the absence of "by" preceding Mullen's name in the signature block indicates Mullen's intent to be bound personally. Pl. Opp. at 10–11, ECF No. 48. The addition of "by" before an agent's name may signal an intent to sign in a corporate capacity only, but this factor alone is not determinative. *See, e.g.*, *Lerner*, 938 F.2d at 4–5 (finding no personal liability when the agreement was signed "T.F.M. Ind. FIRM, By: Frank Lerner, [its] President"); *Integrated Mktg.*, 2006 WL 3627753, at *6–7 (finding personal liability plausible even where "by" preceded the CEO's signature). The issue at the pleading stage is not, however, whether the factors definitively militate in favor of imposition of personal liability. Rather, the Court evaluates the *Lollo* factors to determine whether Plaintiff *could* produce evidence to prove intent. *See Integrated Mktg.*, 2006 WL 3627753, at *7. Here, the Court concludes that the overwhelming weight of the *Lollo* factors favors Plaintiff's claim that Mullen intended to assume personal liability.

Plaintiff's adequate showing of intent, however, cannot overcome the indefinite nature of the Personal Guaranty, which amounts to an illusory promise that is unenforceable under New York law. The Personal Guaranty states, in its entirety, that "Mike Mullen agrees to provide his personal guarantee to stand behind the [p]ut to MMEER in order to ensure payment in full *if necessary*." Agreement § 3 (emphasis added). This provision is an "agreement to agree," conditioned on an undefined and ambiguous future event. *Id.*

Plaintiff's argument that personal guaranties are inherently contingent misconstrues the law. *See* Pl. Opp. at 16. Though the future occurrence that triggers a guaranty can be contingent, to be valid and enforceable, the guaranty itself must be "absolute and unconditional." *Myers Indus.*, 171 F. Supp. 3d at 121. Here, the guaranty clause lacks the usual essential and definite terms. *See, e.g.*, *Griffin v. Bookman*, 346 N.E.2d 534, 535 (N.Y. 1976) (rejecting purported guaranty provision for failing to include material terms and noting that "[a]t best there is but an agreement to negotiate at some future date"). Instead, the provision contains the vague requirement that Mullen "ensure payment in full if necessary," without laying out the specific circumstances that would trigger his duty to cover MMEER's put obligation. As corporate executives, Claar and Mullen should have been well-versed in the practice of providing personal guaranties for corporate debt. Tellingly, three years after the Agreement was executed, CBI transmitted to Mullen a new personal guaranty contract, containing material terms absent from the Agreement—which Mullen refused to sign. *See* Def. Mem. at 3; *see also* ECF No. 45-2. It is not the business of this Court to rewrite the parties' bargained-for contract.

Because an "agreement to agree, in which a material term is left for future negotiations, is unenforceable," Plaintiff has failed to plead a claim for breach of personal guaranty. *Gould v. Lightstone Value Plus Real Estate Inv. Trust, Inc.*, 301 F. App'x 97, 100 (2d Cir. 2008) (internal quotation marks and citation omitted).

Accordingly, Mullen's motion to dismiss the breach of personal guaranty claim is GRANTED.

### 2. Breach of Contract

The elements of a breach of contract claim under New York law are: "(1) the existence of an agreement between the parties, (2) adequate performance of the contract by the plaintiff,

(3) breach of contract by the defendant, and (4) damages." *Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.*, 333 F. Supp. 3d 307, 311–12 (S.D.N.Y. 2018) (internal quotation marks and citations omitted).

Here, the only alleged breach by Mullen is of the Personal Guaranty in the Agreement. Compl. ¶ 77.  Because the Personal Guaranty has been held unenforceable, there is no underlying agreement that Mullen could have breached.

Accordingly, Mullen's motion to dismiss the breach of contract claim is GRANTED.

B.   Counterclaims and Third-Party Complaint

1.   Breach of Contract

MMEER alleges in its counterclaim that CBI breached an oral agreement to raise $150 million in debt financing necessary to complete the rig.  CBI argues, first, that the oral agreement is not admissible under the parol evidence rule; second, that the alleged agreement violates New York's statute of frauds; and third, that MMEER did not allege that it adequately performed under such an agreement.  Counter-Def. Mem. at 7–13, ECF No. 75.  The Court agrees that the parol evidence rule bars a breach of contract claim based on the alleged oral agreement.

"The parol evidence rule generally prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements to explain the meaning of a contract that the parties have reduced to an unambiguous integrated writing.  Such extrinsic evidence may not be used to modify, explain, vary or supplement the written integrated contract." *Gualandi v. Adams*, 385 F.3d 236, 241 (2d Cir. 2004).  Because the Agreement does not have a merger or integration clause, the Court must examine the "surrounding circumstances to see if the parties would ordinarily be expected to embody the [oral] agreement in a writing, based upon the type of transaction involved, the scope of the written contract and the content of any other agreements."

*Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 295 (2d Cir. 1999) (internal quotation marks and citation omitted).  In New York, this inquiry leads to the central question of whether the oral agreement is "so clearly connected with the principal transaction as to be part and parcel of it." *Mitchill v. Lath*, 160 N.E. 646, 647 (N.Y. 1928).

The parol evidence rule bars MMEER's alleged oral agreement for the reasons articulated in *Mitchill*.  In *Mitchill*, the plaintiff claimed that the defendant breached an alleged oral agreement to remove an icehouse located on the land that the plaintiff had contracted to buy.  *Id.* at 646.  The court applied the parol evidence rule to bar admission of the oral agreement, because it concluded that nothing in the written contract suggested that a separate agreement regarding the ice house existed.  *Id.* at 647.  Even if such an oral agreement had been collateral in form, the court reasoned that it was "so closely" related to the "subject dealt with in the written agreement . . . that we hold it may not be proved."  *Id.*  Similarly, here, nothing in the Agreement suggests that a separate oral agreement existed obligating CBI to raise $150 million. The Agreement not only sets forth each party's obligations during stage one of the joint venture, but also contains two terms that explicitly govern the period after the initial payment:  first, that "CBI shall have voting control, including the right, at its sole discretion, to enter into capital transactions proposed by MMEER or others"; and second, that "any fees on additional rounds of funding to this investment will be split on a 50%/50% basis by CBI and MMEER."  Agreement §§ 4, 5.  The alleged oral agreement—that CBI was obligated to obtain a $150 million investment, which was purportedly entered into at the same time as and covered the same subject matter of the Agreement—is so clearly connected with the Agreement that "the parties could have been expected to embody it in that writing."  *Braten v. Bankers Trust Co.*, 456 N.E. 2d 802, 805 (N.Y. 1983).  Because the alleged oral agreement is not enforceable under the parol evidence

rule, MMEER cannot state a breach of contract claim.[3]  *See Mitchill*, 160 N.E. at 647; *see also*

*Fogelson v. Rackfay Const. Co.*, 90 N.E.2d 881, 884 (N.Y. 1950) (rejecting parol evidence where

the written agreement was "complete on its face").

Accordingly, CBI's motion to dismiss the breach of contract counterclaim is GRANTED.

2.  Equitable Accounting

Under New York law, the elements of an equitable accounting claim are:  "(1) a fiduciary

relationship[;] (2) entrustment of money or property[;] (3) no other remedy[;] and (4) a demand

and refusal of an accounting."  *Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.*, 333 F.

Supp. 3d at 315 (internal quotation marks and citations omitted).  "[A]n equitable accounting

claim cannot coexist with a breach of contract claim covering the same subject matter."

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 207

(S.D.N.Y. 2011).

Because MMEER pleads a breach of contract claim covering the same subject matter—

CBI's breach of the alleged oral agreement to secure debt financing, *see* Third Party Compl.

¶¶ 51–65—the equitable accounting claim must be dismissed.  *See Physicians Mut. Ins. Co. v.*

*Greystone Servicing Corp., Inc.*, No. 07 Civ. 10490, 2009 WL 855648, at *11 (S.D.N.Y. Mar.

25, 2009) (dismissing an accounting claim because it "arises from the same operative facts as

plaintiffs' contract breach claim," which was also dismissed).

Accordingly, CBI's motion to dismiss the equitable accounting counterclaim is

GRANTED.

---

[3] The Court need not reach CBI's additional arguments for dismissal on the grounds that the alleged agreement violates the statute of frauds and that MMEER has not alleged its own performance under the oral agreement.

3.   Fraud

MMEER alleges that Claar fraudulently induced it to enter into the Agreement.  To assert

fraud under New York law, a plaintiff must show that:  "(1) the defendant made a material false

representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff

reasonably relied upon the representation, and (4) the plaintiff suffered damages as a result of

such reliance."  *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57

F.3d 146, 153 (2d Cir. 1995).  Claar argues that MMEER's claim is time-barred, that it does not

meet the particularity requirement of the Federal Rule of Civil Procedure 9(b), and that Claar did

not know the statements were false.  Counter-Pl. Opp. at 15–17.  The Court agrees in part.

Although the claim is timely, it must be dismissed because MMEER has failed to satisfy Rule

9(b)'s particularity and scienter pleading requirements.

MMEER's fraud claim is not time-barred, because such a claim does "not accrue when

the fraudulent act is committed, but rather when the plaintiff suffers a loss."  *Asbeka Indus. v.*

*Travelers Indem. Co.*, 831 F. Supp. 74, 81 (E.D.N.Y. 1993) (citing *Cruden v. Bank of New York*,

957 F.2d 961, 974 (2d Cir. 1992)).  Although MMEER entered into the Agreement in early 2013,

MMEER did not suffer the alleged loss until March 2016, when CBI diluted Accommodations

Ltd.'s ownership in the rig from 100% to 12.16%.  Third Party Compl. ¶ 35.  Because MMEER

brought its fraud claim in January 2020, well within six years of its accrual in March 2016, this

claim is timely.  *See* N.Y. CPLR § 213(8) (setting a six-year statute of limitations for a claim of

fraud).

Despite its timeliness, however, MMEER has failed to satisfy Rule 9(b), which requires a

plaintiff to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

Although the rule provides that "[m]alice, intent, knowledge, and other conditions of a person's

14

mind may be alleged generally," this relaxed standard "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks and citation omitted).  Therefore, allegations of fraud under Rule 9(b) must "specify the time, place, speaker, and content of the alleged misrepresentations." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001).  The Court addresses the particularity and scienter requirements in turn.

First, the fraud claim lacks the requisite particularity, because MMEER's pleadings on the content of the allegedly fraudulent statements are vague and inconsistent.  MMEER alleges that:  "Claar . . . represented . . . that he and CBI were sophisticated financiers who . . . could obtain the many millions of dollars in debt financing necessary to complete construction of the rig," Third-Party Compl. ¶¶ 13, 67; "CBI agreed to utilize its resources and purported expertise to acquire via debt financing the balance of the cost to construct the rig," *id.* ¶ 14; and "CBI made numerous representations, and provided many assurances, that it would secure the BOC loan," *id.* ¶ 21.  MMEER, however, does not allege what "resources and purported expertise" CBI indicated it had, what the contents of the alleged "representations" and "assurances" were, and how "many millions of dollars" CBI represented it could obtain.  MMEER's allegations regarding the dollar amount that CBI agreed to secure vary.  *Compare id.* ¶ 52 (alleging that CBI agreed to "obtain the balance of the approximately $150 million" needed to finance the rig), *with id.* ¶¶ 20–21 (alleging instead that CBI agreed to secure a $100 million loan "to make up the difference between the capital that CBI was supposed to raise, and the ultimate cost to construct the [r]ig").  MMEER also does not allege any details—the when, where, and how—regarding these statements.  *See id.* ¶¶ 13, 14, 21, 67.  MMEER fails to clarify these questions in its briefing, merely asserting a three-month window for the alleged sequence of events, *see* Counter-

Pl. Opp. at 27, but failing to explain how this three-month window is connected to the allegedly fraudulent statements. *See* Third-Party Compl. ¶¶ 10, 13–15. Additionally, MMEER does not indicate how these statements were made, such as in person, or by email or phone. *See generally id*. These allegations are ambiguous and conclusory, and do not meet the particularity requirement of Rule 9(b). *Caputo*, 267 F.3d at 191.

Second, MMEER has not sufficiently pleaded scienter. A fraud claim requires facts that give rise to a strong inference of fraudulent intent, which may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128. MMEER's claim fails under both approaches.

MMEER claims that Claar lied about his ability to obtain $150 million in debt financing because he knew MMEER would step in. Counter-Pl. Opp. at 28. But Claar, through CBI, contributed 66.67% of the initial payment and had more ownership interest in Accommodations Ltd. than MMEER did, both before and after dilution. Agreement § 1; Third-Party Compl. ¶¶ 17, 43. MMEER's theory of Claar's motive to commit fraud is, therefore, irrational, because it assumes that Claar would sabotage his own investment by delaying debt financing and then diluting his stake in Accommodations Ltd. The Court is similarly unpersuaded that Claar would be motivated to make "public statements that Accommodations Ltd. could not obtain the financing" to further sabotage his own investment. Counter-Pl. Opp. at 28. "As a matter of law, such allegations of irrational motive cannot support a fraud claim under Rule 9(b)." *Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, No. 04 Civ. 3318, 2005 WL 736217, at *3 (S.D.N.Y. Mar. 30, 2005) (collecting cases).

Likewise, MMEER fails to allege facts showing strong circumstantial evidence of conscious misbehavior or recklessness.  MMEER's claim that CBI breached its alleged promise to raise all debt financing is insufficient, because CBI's failure to fulfill the obligation in 2016 does not demonstrate that Claar knew that CBI could not perform when the promise was made in 2013.  *See* Counter-Pl. Opp. at 25, 27, 29.  In other words, failing to follow through on a promise does not, on its own, establish the presence of fraudulent intent.  *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (holding that a defendant's failure to perform a contractual obligation does not support an inference that defendant knew or believed it could not be performed when defendant entered into the obligation eight months earlier).  MMEER also alleges that, after Claar represented to MMEER that he could obtain debt financing, Claar said the opposite in public statements, and stated that Accommodations Ltd. would not be able to secure funding.  Counter-Pl. Opp. at 29.  The Court, however, finds MMEER's allegations of Claar's fraudulent state of mind in making such public statements to be conclusory, because it would have been irrational for Claar to make statements that would sabotage his own investments.  *See Hampshire Equity Partners*, 2005 WL 736217, at *3 (collecting cases where claims of fraud were dismissed because the theory of scienter was irrational, illogical, or defied economic reason).  Therefore, the Court concludes that MMEER has not met the pleading requirements to state a claim of fraud.

Accordingly, Claar's motion to dismiss the third-party complaint is GRANTED.

17

## CONCLUSION

For the foregoing reasons, Mullen's motion to dismiss claims two and three of the complaint is GRANTED, and CBI and Claar's motion to dismiss the counterclaims and the third-party complaint is GRANTED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 44, 58, and 74.

By **July 21, 2020**, any party wishing to move for summary judgment shall provide all other parties with its Rule 56.1 statement, pursuant to Rule III.C of the Court's Individual Practices in Civil Cases.  By **July 24, 2020**, non-moving parties shall provide responses to moving parties' Rule 56.1 statements.  By **July 30, 2020**, the parties shall file any pre-motion letter for summary judgment.

SO ORDERED.

Dated:  July 16, 2020
        New York, New York

_____
ANALISA TORRES
United States District Judge